## In re RACK ENGINEERING COMPANY, Debtor.

**Bankruptcy No. 93–23127–MBM.**

United States Bankruptcy Court, W.D. Pennsylvania.

Sept. 13, 1996.

## MEMORANDUM OPINION

M. BRUCE McCULLOUGH, Bankruptcy Judge.

### STATEMENT OF FACTS

Rack Engineering Company (Rack), the debtor in this case, filed its Amended Chapter 11 Plan of Reorganization (hereafter referred to as the "plan" unless the context indicates otherwise) on November 21, 1995.[1] Fremont Financial Corporation (Fremont), the primary lender to Rack pre-petition, has objected to confirmation of Rack's plan pursuant to 11 U.S.C. § 1128(b). This Court, pursuant to § 1128(a), has held numerous hearings regarding confirmation of the plan with the final hearing on August 12, 1996. The primary issue explored at all of the hearings,[2] and the ultimate issue upon which confirmation of Rack's plan turns, is the feasibility of the plan. This opinion and the accompanying order set forth this Court's decision regarding confirmation of Rack's plan and, in particular, its feasibility.

Rack filed its voluntary petition commencing this case on September 3, 1993. It filed its first plan of reorganization on September 8, 1995, after operating as a debtor in possession for most of the preceding 2 years (a Chapter 11 trustee was appointed for a period of approximately 4 months in 1994). Rack has continued to operate as a debtor in possession since filing its initial and amended plans for reorganization as well as accompanying disclosure statements.

Exhibit E to Rack's disclosure statement sets forth pro forma financial statements and, in particular, income statements for the first six years subsequent to potential confirmation of Rack's plan. The pro forma income statements indicate that Rack anticipates significant growth in its net sales, beginning with a net sales figure of $1,644,500

Steven J. Laidhold and Michael Kaminski, Pittsburgh, PA, for Fremont Financial Corp.

William E. Kelleher, Jr., Pittsburgh, PA, for Rack Engineering Company.

Steven T. Shreve, Pittsburgh, PA, for Unsecured Creditors' Committee.

Jeffrey P. Trout, Boston, MA, for Pension Benefit Guaranty Corporation.

John W. Smart, Pittsburgh, PA, for United Steel Workers of America.

1. Rack apparently filed another amended plan of reorganization on December 14, 1995, along with a disclosure statement. However, for the purpose of evaluating feasibility, the Court does not distinguish any significant differences between the two versions of the amended plan.

2. The Court has also dealt periodically with the debtor's motion to reject its present collective bargaining agreement pursuant to 11 U.S.C. § 1113. The parties to that motion have stipulated that hearings regarding that motion be stayed pending the Court's decision regarding plan confirmation. At least for the time being, the Court now views that motion as moot on the basis of its decision herein regarding confirmation of the debtor's plan.

in the first year and culminating in net sales of $5,221,000 in year 6. Rack concedes that the achievement of such growth in its sales is essential to the ultimate success of the plan. Net sales for fiscal year ending (a) March 31, 1996, were $1.234 million, (b) March 31, 1995, were $1.644 million, and (c) March 31, 1994, were $1.155 million. Rack went through a Chapter 11 reorganization in the mid–1980's, having filed a petition for bankruptcy protection then on May 23, 1985. Pertinent net sales figures prior to 1985 tended to exceed $3 million annually, and approximated $6 million in 1979. The industry within which Rack operates is mature rather than expanding, and moderate growth at best is projected within the industry over the life of the plan.

Rack, as part of its amended reorganization plan, contemplates significant, if not wholesale, changes in the method by which it would continue to conduct its business. In particular, Rack, which has historically been a manufacturer and wholesaler of cabinet and storage fixtures, proposes in its amended plan to contract out the manufacturing function through a fabrication agreement, thereby leaving to itself the sales function in the future. Rack asserts that this arrangement would allow it to realize cost savings. Rack's fabrication agreement, which has not yet been fully executed, is with a manufacturer in Quebec, Canada. This manufacturer is not familiar with, nor has it manufactured in the past, finished products similar to those contemplated in the fabrication agreement. However, Rack intends to provide training and assistance regarding the production of its products. Rack steadfastly maintains that such training would constitute only a minimal burden upon itself, and that it could be completed in perhaps 2 weeks. The products, upon their completion, would be shipped to a location in Pennsylvania, from which point they would then be shipped to their ultimate purchasers. Although Rack asserts that its transportation costs would, if anything, decrease as a result of its proposed change in operations, this point, which created a source of contention for Fremont, was never thoroughly explored in the hearings. As part of the fabrication agreement, Rack also contemplates moving certain of its equipment, machinery, and inventory to the location of the Canadian manufacturer. This property is all currently subject to a security interest in favor of Fremont.

Pertinent expense figures extracted from Rack's pro forma income statement for the first year post-confirmation are: Travel expenses—$17,000, Auto expense—$6,400, and Advertising, promotional & literature expenses—$12,000. Rack's pro formas also indicate that it anticipates 100 percent success in collection of its accounts receivable during the life of the plan, and that collection apparently would occur within the year that such receivables are generated. Pursuant to an order of this Court dated June 18, 1996, which was entered subsequent to a hearing on June 4, 1996, Rack was directed to "secur[e] the services of a senior sales person capable of performing within the projections and parameters of the pending plan." This Court determined that such services were essential, although not necessarily conclusive as, to the success and/or feasibility of the plan. Rack, by the time of the final hearing, had tentatively entered into an agreement for the services of such a person, and had tentatively agreed to compensate that person at the rate of $50,000 for the first year. The selected person, although possessing substantial sales experience, does not have any experience in sales involving products similar to that of Rack.

Rack's plan contemplates the sale of "excess" equipment, machinery, and inventory, which is essentially comprised of that which would not be shipped to the Canadian manufacturer for use in the fabrication agreement and, perhaps, certain of that which would ultimately not be used by the Canadian manufacturer. Rack proposes in its plan to utilize the funds that would be obtained from this sale to reduce the principal of Fremont's outstanding secured claim against Rack. Fremont's secured claim presently approximates $540,000. Rack, in its Exhibit E, projects a liquidation of such "excess" property for approximately $330,000. Therefore, a distribution of such anticipated amount to Fremont would then reduce Fremont's outstanding claim to approximately $210,000,

such residual balance to then be funded by monthly payments as set forth in the plan. The parties agree that much of Rack's property is, by all accounts, fairly old considering that certain of the property dates back as far as 1921. Furthermore, the parties also agree that much of the excess inventory to be liquidated is scrap that would, at best, return a small percentage of its cost. Rack's plan also calls for the sale of certain real property with the proceeds going to fund outstanding related real estate taxes and various unsecured priority claims. With respect to plan payments to Fremont, Rack arrived at a monthly payment amount using an interest rate that presently approximates 8.5 percent (i.e., 5–year Treasury rate plus 2 points). However, in its order dated June 18, 1996, this Court also approved the parties' mutual agreement to amendment of the plan such that Fremont would continue to receive interest (via the plan payments) at its current "contract rate," or 13 percent. This amendment is not reflected in the cost figures set forth in Rack's pro forma financial statements. Rack presently proposes to retire its obligation to Fremont in either 5 or 6 years, or essentially over the life of the plan.

At status conferences held during the past three months Rack indicated that it had not been successful in locating additional sources of capital, either debt or equity. Rack's balance sheet presently evidences negative equity capital as Rack's liabilities exceed its assets by whatever method they are valued. Rack's "Inventory Analysis" as of April 30, 1996, Exhibit 102, lists total inventory at $563,160, with total work-in-process at $406,-165. Most, if not all, of Rack's prior financial numbers have been professionally reviewed although not audited. With respect to Rack's pro formas, Rack, by its own admission, has borrowed heavily from a marketing plan developed by an outside consultant. This outside study was performed in November of 1994. Rack admittedly has not yet closely followed the marketing strategies set forth in the outside study because, it asserts, its financial condition during that time period would not allow it.

## DISCUSSION

A court may confirm a plan in a Chapter 11 case only if, *inter alia*, "[c]onfirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan." 11 U.S.C.A. § 1129(a)(11) (West 1993). Because Rack's plan contemplates its continued existence subsequent to full execution of the terms of the plan, this Court is obligated to ascertain not only whether "the plan, qua plan can be performed ... [but also] that regardless of plan performance, the business is such that it can continue; [ie.,] it will not need liquidation or further reorganization." 5 *Collier on Bankruptcy*, para. 1129.02[11] at 1129–63 (Bender 1996). This test of feasibility necessitates an inquiry into numerous factors, such as:

(1) the adequacy of the [debtor's] capital structure; (2) the earning power of the [debtor's] business; (3) economic conditions [that the debtor will face]; (4) the ability of [the debtor's present] management; (5) the probability of the continuation of the same management; and (6) any other related matters which determine the prospects of a sufficiently successful operation to enable performance of the provisions of the plan.

*Id.* at 1129–64 (cited in *In re Landmark at Plaza Park, Ltd.*, 7 B.R. 653, 659 (Bankr. D.N.J.1980)).

When engaging in a determination of feasibility, a "court need not require a guarantee of success ... [but, rather, o]nly a reasonable assurance of commercial viability." *In re Lakeside Global II, Ltd.*, 116 B.R. 499, 507 (Bankr.S.D.Tex.1989). *See also In re Ridgewood Apartments of DeKalb County, Ltd.*, 183 B.R. 784, 789 (Bankr.S.D.Ohio 1995); *Matter of IPC Atlanta Ltd. Partnership*, 142 B.R. 547, 559 (Bankr.N.D.Ga.1992). However, a court cannot confirm "visionary schemes which promise creditors and equity security holders more under a proposed plan than the debtor can possibly attain after confirmation ... notwithstanding the proponent's sincerity, honesty and willingness to

make a best efforts attempt to perform according to the terms of the plan." 5 *Collier on Bankruptcy,* para. 1129.02[11] at 1129–61 to 63 (citing *Tennessee Publishing Co. v. American National Bank,* 299 U.S. 18, 22, 57 S.Ct. 85, 87, 81 L.Ed. 13 (1936)). Furthermore, it is an axiom of common sense that "proof of feasibility is an easier task when payouts [to creditors] are done over shorter periods of time [because, t]he longer the debtor proposes a payout, the more difficult it may become to prove distant ability to service debts." 5 *Collier on Bankruptcy,* para. 1129.02[11][a] at 1129–64 (citing *In re White,* 10 C.B.C.2d 308, 315, 36 B.R. 199 (Bankr.D.Kan.1983)). To this Court it seems obvious that more extended payout schemes should necessarily be evaluated with additional skepticism.

Authority is also clear, and this Court observes and acknowledges, that a bankruptcy court has broad discretion in resolving the issue of feasibility. However, the Court wishes to make clear at the outset of its analysis its position that it must exercise such discretion with restraint, and only after an elevated level of review, when a proposed reorganization plan includes a "cramdown" of a creditor(s) under 11 U.S.C. § 1129(b)(2), and/or modification of a labor agreement pursuant to § 1113, because these are both exceptional tools that are unique to the bankruptcy process. The Court notes, as an initial matter, that Rack's plan includes both of these elements because its terms provide, *inter alia,* that (a) Fremont's secured claim will be satisfied with deferred payments over the life of the plan, thus resulting in a "coerced" continuation of Fremont's creditor relationship with the debtor, and (b) Rack's present collective bargaining agreement will be rejected, thereby resulting in the termination of employment of its manufacturing employees. Against this backdrop, and after a long and laborious consideration of all of the pertinent factors as applied to the debtor's plan, this Court finds that it must, for the following reasons, hold that the debtor's plan should not be confirmed. Although not necessary to this Court's decision, this Court nevertheless feels obligated as well, in the interest of efficiency and given the long period of time that this debtor has remained in this bankruptcy, to make clear that its decision is, frankly, not a close call.

## I. The inadequacy of Rack's capital structure and its inability to attract additional financing.

This Court views Rack's present capital structure and its inability to immediately improve such as perhaps the most important factor dictating this Court's decision not to confirm Rack's plan. The Court does not believe that it is alone in according this much weight to this factor. *See In re Stratford Associates Ltd. Partnership,* 145 B.R. 689, 699 ("Generally, without proper funding in place or a firm commitment of such funding, the Court cannot find the plan feasible") (citing *In re ARN LTD. Limited Partnership,* 140 B.R. 5, 9 (Bankr.D.Colo.1992); *Matter of Holiday Associates Ltd. Partnership,* 139 B.R. 711, 717 (Bankr.S.D.Iowa 1992); and *In re Sovereign Oil Co.,* 128 B.R. 585, 586–87 (Bankr.M.D.Fla.1991)). The Court views the securing of additional sources of financing, either equity or debt, as imperative so that the debtor could successfully deal with contingencies during the life of the plan, and in particular, in the early years given the substantial changes in Rack's operations as proposed in the plan.

Although the debtor testified that its sales forecast is conservative so as to take into account such contingencies, this Court views such forecast as anything but conservative given that it contemplates a 317 percent increase over 6 years, and that such forecast is made notwithstanding (a) the debtor's previous financial struggles culminating in both an earlier bankruptcy as well as this particular bankruptcy filing, (b) its downward trend in earnings over the past 3 years when compared to earnings of approximately 10 years prior when it emerged from its previous reorganization, and (c) that the debtor's industry, which is mature as opposed to expanding, has an expectation of moderate growth at best in the near future. While not condemning the debtor's optimism, this Court simply cannot confirm a plan that has not properly allowed for unforeseen events. For instance, and as Fremont asserts, training and assistance to the proposed fabricator in

Canada could require unanticipated outlays of substantial funds in the first year of the plan notwithstanding the contrary assertions of the debtor.[3] As well, the economic conditions of the industry within which Rack would continue to operate could, through no fault of Rack, deteriorate significantly for short periods of time such that Rack, without any cushion to which it could resort, would be devastated. Such devastation might occur if Rack were to breach, in any material respect, the fabrication agreement given that such breach, if not cured immediately, would permit the fabricator to summarily terminate the contract. With respect to termination of the fabrication agreement, the Court is also perplexed by the clause therein that permits the fabricator to terminate such contract in the event that Rack may be "declared insolvent." As was established by expert testimony, this event might occur early in the life of such contract were Rack's reorganization to go forward given that Rack appears, to this Court as well, to presently be in an insolvent state.

Additionally, this Court cannot ignore the debtor's total projected expenditure of $35,-400 in the first year of its plan for travel expense, auto expense, and advertising, promotional and literature expense. Rack reported net sales and selling expenses for its fiscal year ending March 31, 1996[4] of, respectively, $1.234 million and $100,616. However, Rack projects that its net sales in the first year of its plan would improve to $1.6445 million, and that selling expenses of $35,400 would be sufficient to accomplish such improvement. The Court is astonished by this projection[5] and, thus, finds that a budget of $35,400 for these items is both unreasonable and surprisingly low given that (a) Rack admittedly seeks to change the emphasis of its operations from manufacturing to *sales*,[6] (b) the debtor's own prior experience demonstrates that such a low expenditure is insufficient to achieve such a growth in sales or, for that matter, the sales levels that it has previously achieved, and (c) the ultimate success of the plan is dependent upon Rack's success in marketing itself to the public. Because the sales function is critical to Rack's future success, the Court would have expected that the debtor would project an increase in its marketing costs in the early years of its plan and, in particular, in the first year, rather than a decrease in such expenditures as it has proposed for the initial years of the plan. Such amount is also noticeably less than that called for in the outside marketing study, which Rack has heavily relied upon to substantiate its net sales estimates. Additionally, if for no other reason, a notion of common sense dictates that such a budget is unreasonably small; indeed, Fremont, in its questioning of the debtor during the hearings on confirmation, has successfully exploited in detail this notion of common sense. Finally, the Court observes that the debtor itself recognizes the importance of its marketing effort as evi-

3. The debtor concedes that the Canadian fabricator's employees predominantly speak French, which is to be expected given that the fabricator is located in Quebec. Fremont expressed concerns regarding this fact vis-a-vis the debtor's projected expenditures. The Court cannot help but agree with Fremont in this regard.

4. These figures were taken from Rack's income statement for the fiscal year ending March 31, 1996, which was included in its Monthly Report for March 1996 as filed with the United States Trustee.

5. The Court also draws support for its conclusion from Rack's income statement for the 4-month period ending July 31, 1996, which was included in its Monthly Report for July 1996 as filed with the United States Trustee, wherein the debtor reports net sales of $362,033 on the basis of $32,754 in selling expenses. When projected out for 12 months, Rack will achieve net sales in the present fiscal year of $1,086,099 on $98,262 in selling expenses. Once again, Rack's own historical information establishes clearly that it could not spend approximately one third of the amount that it has historically spent for selling expenses and thereby improve its net sales.

6. Because of the debtor's proposed change in its operations, it would no longer experience certain of its fixed and variable manufacturing costs that have affected its previous financial performance. However, since it proposes to focus its attention exclusively on the sales function in the future, the debtor cannot represent to this Court that its marketing costs would not play an important part in its financial performance post-confirmation. Rather, the Court would expect that such costs should, if anything, increase in amount post-confirmation given that the debtor would only need to concern itself with this portion of its present business.

denced by its restoration of such expenditures by the third year of the plan. The Court feels that this emphasis on marketing expenditures is misplaced only in that it must occur immediately, rather than by the third year of the plan, so that Rack could survive until later years when it may become more profitable.

Finally, this Court notes that Rack's principal shareholder would, pursuant to terms of the plan, emerge as Rack's sole shareholder. Although the debtor points out in its disclosure statement that this term is included, at least in part, to compensate that shareholder for other prior compensation that he has foregone in his capacity as an officer of Rack, this Court also notes that said shareholder and his wife, who is also apparently an employee of Rack, have nevertheless received in the past 3 years, and would continue to receive over the life of the plan, their base salaries approximating a combined $85,000 annually. Although this Court recognizes that this shareholder is not legally required, nor even perhaps morally bound, to make additional concessions/contributions of his own, the Court cannot help but speculate as to the reason for said shareholder's unwillingness to aid in Rack's recapitalization. Further fueling this Court's speculation is its understanding that Fremont and Rack's manufacturing employees, pursuant to terms of the plan, would be "coerced" into providing such aid without any prospect for a return other than payment of their claims, while the principal shareholder, were he to emerge as sole shareholder, would, of course, receive all of the benefits from appreciation in the debtor's stock. The Court does not—indeed cannot—view this outcome as equitable under any circumstances.[7]

Therefore, notwithstanding that the debtor anticipates both incremental improvement in its performance over the life of the plan and that such improved performance, by itself, could support the debtor's projections, this Court simply cannot share in such optimism without evidence of some sort of *meaningful* *immediate* cash infusion. Without such immediate additional financing, the Court is constrained, on that basis alone, to deny confirmation of the debtor's plan.

## II. *The earning power of the debtor's business.*

Also vital to this Court's decision are the debtor's projections because, "[w]here the financial realities do not accord with the proponent's projections or where the proposed assumptions are unreasonable, the plan should not be confirmed." *In re Lakeside Global II, Ltd.*, 116 B.R. at 507 (citing *Stapleton v. Archer Daniels Midland Co.*, 55 B.R. 716, 721 (S.D.Ga.1985)). As mentioned above, this Court views as incredibly optimistic the debtor's forecast of a 317 percent increase in Rack's annual net sales over the 6–year life of its plan. The Court simply cannot accept as realistic this projection, given that it is made in the face of circumstances such as the debtor's previous financial struggles, a downward trend in the debtor's earnings, and the expectation of moderate growth in the debtor's mature industry. The Court has now also noted its reservations regarding Rack's capital structure and what the Court perceives as the likely negative impact that said structure would have on Rack's performance in the immediate future. However, the Court must also express additional concerns that it has with the debtor's projections.

Rack's plan contemplates in the first year a capital gain of approximately $330,000, apparently net of tax, from the sale of its "excess" equipment, machinery, and inventory. Rack has earmarked these proceeds for partial satisfaction of Fremont's secured claim. The Court finds that this forecast is, if not unreasonable, at least perhaps overly optimistic given that (a) much of the equipment and machinery is very old, and (b) the inventory can only be liquidated as scrap which will return only cents on the dollar. As part of its plan Rack also proposes to sell

---

7. Also contributing to the Court's difficulty with the equities of the plan is the fact, as testified to by the principal shareholder, that he acquired most, if not all, of his present equity interest in the debtor in 1992 when he became its president and chief executive officer. In response to a question from the Court, this shareholder indicated that he received this equity interest at that time without having to make any monetary contribution to the debtor.

certain real property for $262,500, with the proceeds going to fund outstanding real estate taxes and various unsecured priority claims. Fremont apparently does not possess a mortgage on this particular property. The debtor concedes that it could have attempted to consummate this sale in 1995 as the contract for its sale has existed since then. Additionally, the debtor could have then leased back this realty for 3 years at $1.00 annually pursuant to a lease contract which accompanied, and was incorporated into, the sales contract. However, the debtor has not yet attempted to close on this sale for reasons that are not entirely clear to the Court. Nevertheless, the Court has serious concerns regarding the debtor's failure to seize upon this opportunity immediately given (a) the debtor's obvious need for cash, and (b) the provision in the sales contract to the effect that this Court's prospective order approving said sale would have to restrict the debtor's use of the sales proceeds such that the debtor could only satisfy secured claims therefrom to the extent of $40,000 (apparently the amount of real estate taxes outstanding thereon). If $222,500 of the sales proceeds would have been unencumbered at the time of their receipt by the debtor, at least a portion thereof could have been utilized to address the debtor's obvious working capital problem and/or any shortfall that the debtor would undoubtedly realize from the sale of its "excess" equipment, machinery, and inventory. Notwithstanding the debtor's assertion that its plan presently provides for an alternative usage of the $222,500 in unencumbered proceeds, this Court remains unconvinced that such funds could not have been utilized in the manner that it proposes.

This Court is also perplexed by certain of the information contained in the debtor's financial statements as filed monthly with the U.S. Trustee and, in particular, the data therein regarding Rack's cost of sales and inventory levels. The Court, after having conducted its own review, and also in light of certain testimony of an expert witness produced by Fremont, is left with some doubt as to the validity of the data regarding these particular items. While the Court cannot conclude with certainty that ending inventory is overstated and that cost of sales have been previously understated, which would indicate overstatements by the debtor of its net sales income in previous years,[8] that possibility cannot be ignored and must be factored into this Court's analysis of the debtor's projections. Furthermore, testimony has clearly established that these financial statements, while they have been reviewed, are nevertheless unaudited. The Court, because it cannot ascertain any benefit from doing so, and so as not to unduly lengthen this opinion, does not wish to elaborate on this point further at this time. The Court wishes to make clear, however, that this observation is not meant to call into question the debtor's integrity but, rather, merely that the Court experiences some uneasiness with certain of the debtor's historical financial data that necessarily impacts upon its projections.

This Court must also remind the debtor that, by its own admission, it has not closely followed many of the marketing strategies set forth in the outside study subsequent to that study's completion in November of 1994. The debtor concedes that the economic conditions of its industry have changed in the period subsequent to the study's completion and, thus, that certain of the presumptions and projections included therein may no longer be valid. Furthermore, the debtor also admits that its own cost budgets occasionally deviate from those set forth in the marketing study, particularly in early years of the plan. These points necessarily provide a basis for criticism given that the debtor has also admittedly relied heavily upon such study in arriving at its projections. Such criticism must also stand notwithstanding the debtor's assertions that its financial condition during that period hampered it in implementing much of the strategies set forth in the study.

This Court also cannot accept as realistic the debtor's assumption, set forth in its pro

---

**8.** Cost of goods sold is generally determined by subtracting from total inventory available for sale that which remains in ending inventory. Therefore, if ending inventory is overstated, cost of goods sold is consequently understated. Of course, if cost of goods sold is understated, net sales income will necessarily be overstated.

forma financial statements, that it would collect 100 percent of its accounts receivable during the life of the plan with such collections to occur, apparently, within the year that such receivables are generated. The Court is in agreement with expert testimony that "[t]here's not many businesses ... that collect 100 percent of their accounts receivable." Moreover, the Court cannot imagine that there are any businesses that, on a practical basis, are successful in collecting all of their receivables within the same year that they are generated. Finally, the debtor has not presented evidence to the Court that its own historical experience has been this favorable. However, the Court agrees that such a performance by the debtor might be necessary, if not essential, given the extremely tight profit margins that Rack projects on its net sales (ie., 2.9% to 6.9%), coupled with the projected debt service that it would need to maintain over the life of the plan.

The results of this Court's order of June 18, 1996, also would contribute to the debtor's cash flow problems. That order approved Rack's agreement to adjust upwards in amount the plan payments that would be made to Fremont so as to reflect a proper interest rate.[9] In the same order, the Court directed the debtor to increase its projected executive payroll expense in the first year post-confirmation by tentatively hiring a senior salesperson capable of immediately implementing the plan. Rack admits that its projections do not provide for the increase in plan payments to Fremont, which increase

this Court conservatively estimates at approximately $33,000, or $6,600 annually. Furthermore, notwithstanding testimony by the debtor that its projections include a provision in the first year for compensation of the senior salesperson in question, this Court's perusal of said projections cannot confirm such fact. That being the case, Rack's projected executive payroll expense may be understated by as much as $50,000, which is the anticipated annual salary of the senior salesperson. Because the debtor projects its cash position in the first year of the plan to be a positive $40,400, based on its projection in that year of $114,000 in net income and allowing for its projected debt service, this Court finds that it would be highly improbable, if not impossible, for Rack to withstand in its first year a negative cash flow adjustment of $56,600.

For the aforementioned reasons, this Court views the debtor's future earning power as incapable of supporting its plan.[10] On this basis alone as well, this Court feels constrained to deny confirmation of the debtor's plan.

### III. *Economic conditions in the debtor's industry.*

As alluded to in other portions of this opinion, the parties recognize both that Rack is in an industry that is mature as opposed to expanding, and that growth within this industry will be moderate at best over the life of the plan. Rack, by its own admission, is

---

**9.** This Court noted at the hearing which preceded its June 18, 1996 court order that, had the parties not mutually agreed to the plan amendment that increased the financing rate built into Rack's plan payments to Fremont, it would have sustained Fremont's objection to the plan and rejected confirmation at that time. The Court felt that the current contract rate of 13 percent was the minimum rate necessary to comply with 11 U.S.C. § 1129(b)(2)(A)(i)(I)(II) because (a) Rack, in its Chapter 11 plan, seeks to "cramdown" Fremont, thereby coercing Fremont into involuntarily continuing in a creditor relationship with Rack, (b) the Third Circuit has mandated that the appropriate interest rate in such a situation is "the interest rate that ... [a coerced creditor] would charge, at the time of the effective date of the plan, for a loan of similar character, amount and duration," *General Motors Acceptance Corporation v. Jones,* 999 F.2d 63, 70 (3rd Cir.1993), and (c) although *Jones* was decid-

ed in the context of a Chapter 13 cramdown, this Court cannot perceive any reason for deciding the issue differently when considering a cramdown in Chapter 11. Moreover, the Court considers the amendment to have been more than fair given that the only existing capital that Rack could commence its plan with represents that which Fremont has contributed in the form of the "coerced" loan.

**10.** At least for the time being, the Court views as moot the debtor's motion to reject its collective bargaining agreement pursuant to § 1113. However, the Court cannot help but note that the additional delay necessitated by proceedings under § 1113, as well as possible damages for contract breach and additional costs of litigation, might also pose a further obstacle for the debtor in the event that this plan were confirmed.

aware of both of these conditions yet it has forecast a 317 percent increase in its net sales over the next 6 years. Rack asserts that it can realize this bold prediction by cutting into other organizations' market shares within the industry. This Court, because of the other reservations that it has with Rack's plan, cannot accept as feasible such a performance goal. Rather, this Court views the present economic state of the industry within which Rack resides as yet another obstacle to the accomplishment of Rack's plan, which the Court views as tenuous for many other reasons.

### IV.  *Management of Rack.*

The significance of Rack's management to this Court's decision has been diminished given the impact of other factors. This Court nevertheless wishes to point out that, with the exception of the tentative hiring in the first year of a senior salesperson, Rack's executive payroll in the first year, as projected in its plan, would not experience any substantive change other than the reallocation of existing personnel to different functions within Rack's renovated operations. The Court cannot view this administrative strategy favorably given that the debtor proposes to change entirely the emphasis of its operations from manufacturing to sales. Moreover, the wisdom of the debtor in its tentative hiring of the senior salesperson (ie., the exception) must also be questioned because the selected person, although possessing substantial sales experience, does not have any experience in sales involving products similar to that of Rack. As was pointed out on numerous occasions during the confirmation hearings, one of the documented complaints among dealers of Rack's products was their lack of contact with salespeople capable of educating them regarding Rack's products. Although the Court does not doubt that this particular salesperson or, for that matter, any salesperson could eventually become sufficiently educated so as to be capable of successfully marketing Rack's products, there would undoubtedly be a noticeable lag period before such education could be completed. Upon cross examination, Rack's own expert witness testified that this lag period could last perhaps as long as 6 months to 1 year. A lag period of this length would certainly constitute an obstacle to Rack's accomplishment of its sales objective in the first year of its plan.[11] Therefore, were the matter in doubt, Rack's management, both in its present state and as anticipated during the first year of its plan, would also dictate that this Court not confirm its plan.

### CONCLUSION

For all of the foregoing reasons, this Court holds that Rack's Amended Chapter 11 Plan of Reorganization is not feasible as required by 11 U.S.C. § 1129(a)(11). Therefore, the Court is constrained to, and hereby does, **DENY** confirmation of said plan. An appropriate order will be entered.

### ORDER OF COURT

**AND NOW,** this **13th day** of **September, 1996,** upon consideration of the debtor's Amended Chapter 11 Plan of Reorganization (the "plan") in the context of its potential confirmation pursuant to 11 U.S.C. § 1128(a), as well as the objections of Fremont Financial Corporation pursuant to 11 U.S.C. § 1128(b), and after notice and numerous hearings concluding on August 12, 1996, regarding feasibility of the plan, it is **hereby**

---

11.  The Court also notes that the debtor, through the testimony of its principal shareholder and chief executive officer at the June 4, 1996 hearing, represented to the Court that it could, within 30 days, identify a person "capable of performing *within the projections and parameters of the pending plan."* Because of the aforementioned lag period, the Court feels certain that its order has not yet been complied with, at least in spirit if not also technically. Furthermore, the Court must also remind the debtor that, notwithstanding its self-imposed time frame of 30 days, it took nearly 70 days within which to tentatively secure the services of the person that it ultimately selected. Unfortunately for the debtor, the Court feels constrained to view this as a precursor to the troubles that the debtor would experience were the Court to confirm this plan because (a) many of the debtor's projections will necessarily fail were it to commit similar errors in punctuality (i.e., time is money), and (b) the Court perceives such future errors as likely given the liberal nature of the debtor's projections.

**ORDERED, ADJUDGED, AND DE-CREED** that:

1. Rack's plan is not feasible as required by 11 U.S.C. § 1129(a)(11) because of, *inter alia,* (a) the inadequacy of Rack's present capital structure and its inability during the hearing process to immediately improve such, (b) the debtor's lack of future earning power such that it could successfully execute its plan, (c) the obstacles presented by economic conditions in the debtor's industry, both present and anticipated, and (d) Rack's inability thus far to soundly restructure its management in light of wholesale changes in its future operations as contemplated in its plan.

2. Because Rack's plan is not feasible, this Court cannot confirm it under 11 U.S.C. § 1129. Therefore, confirmation of Rack's plan is **DENIED**.