### In re MALLARD POND LIMITED, Debtor.

### Bankruptcy No. 96–08827.

United States Bankruptcy Court, M.D. Tennessee.

Oct. 29, 1997.

Linda W. Knight, Gullett, Sanford, Robinson & Martin, P.L.L.C., Nashville, TN, for Debtor.

David E. Lemke, Robert A. Guy, Jr., Waller Lansden Dortch & Davis, P.L.L.C., Nashville, TN, for Condor One, Inc.

Michael Collins, Asst. U.S. Trustee, Office of U.S. Trustee, Nashville, TN.

## MEMORANDUM

ALETA A. TRAUGER, Bankruptcy Judge.

### I.  Facts

#### A.  Project History

Mallard Pond Limited is a limited partnership that was formed, pursuant to the Tennessee Uniform Limited Partnership Act, on July 19, 1985. The general partner is Beuerlein, Wunderlich & Company, the partners of which are James M. Beuerlein and Walter G. Wunderlich, Jr. The partnership was formed for the purpose of acquiring, leasing, and eventually selling a multi-family apartment complex in Memphis, Tennessee known as the Mallard Pond Apartments.[1]

Pursuant to a private placement memorandum, twenty-two (22) units of limited partnership interest at $158,337 per unit were sold for a total of $3,483,414. The partnership obtained funds to finance the remainder of the $7,375,000 purchase price from Ger-

---

1. The real property includes approximately 2/3 of a pond which is on a different parcel of property from the improvements but which is immediately adjacent. There is a separate loan secured by a lien against this property. Condor One, Inc. purchased and is now the holder of the claim against the debtor on this property.

mantown Savings & Loan Association of Germantown, Tennessee.

In 1987, the partnership refinanced the mortgage indebtedness with DRG Funding Corporation of Washington, D.C. The DRG indebtedness was backed by the Department of Housing and Urban Development ("HUD") as a Section 233f guaranteed loan. HUD sold and assigned this indebtedness to Lennar Atlantic Partners Limited Partnership on August 1, 1996. Lennar sold and assigned this indebtedness to Condor One, Inc. in September 1996.

The project is a 360–unit apartment complex located in a low income, high crime area of Memphis. It houses 64 one-bedroom, one-bath units; 56 two-bedroom, 1½ bath units; 68 two-bedroom, two-bath units; 50 two-bedroom, two-bath units with a den; 44 three-bedroom, two-bath units; 36 three-bedroom, two-bath townhouses; and 42 three-bedroom, 2½ bath townhouses. The project was built in 1968 and is in need of substantial maintenance and capital improvements. As of the confirmation hearing, there were as many as 25 "down units" that were in need of maintenance to become habitable and 16 units so unable to be rehabilitated that they are scheduled for demolition.

The property was managed by Hurd Investment Properties, Inc. of Madison, Tennessee from 1985–1987. In 1987, Denizen Management Company, Inc., owned by Mr. Beuerlein and Mr. Wunderlich, took over management. Denizen went out of business after some years, and Asset Realty & Management Co., LLC became manager of the property. Asset Realty is owned by the wives of Mr. Beuerlein and Mr. Wunderlich, but the husbands run the company. Since 1994, Asset Realty has contracted out the accounting-type management functions to Continental Property Management, a Nashville-based company headed by Mr. Charles Biter. Asset Realty is still responsible for day-to-day operation. First Security Services International, Inc., again owned by their wives but run by Beuerlein and Wunderlich, supplies security guards.

### B. Case History

The debtor's Chapter 11 petition was filed on the morning of October 3, 1996. A hearing in state court on Condor's request for the appointment of a receiver was scheduled for that afternoon but was stayed by the bankruptcy filing.

The debtor has remained in possession of the property and has continued the operation of the business. Early in the case, the debtor and Condor entered into an Agreed Cash Collateral and Adequate Protection Order. The debtor has been operating under extensions of that order since the filing.

During the pendency of this case, almost every issue has been aggressively litigated. In April 1997, the court held a two-day hearing on Condor's motions for relief from the stay and for the appointment of a trustee, among other things. In June 1997, the court held a two-day valuation hearing and set the value of the property and improvements (and hence the amount of Condor's allowed secured claim) at $2,650,000. Condor, whose total claim exceeds $14.2 million, appealed that ruling.

The debtor filed its first Chapter 11 plan on January 30, 1997. It has amended the plan three times. The last amendment was necessitated by Condor's making the § 1111(b) election.

The confirmation hearing on the debtor's Third Amended Plan commenced on September 11. After the two days that had been set aside for the entire hearing, only the debtor had concluded its proof. The reconvened hearing scheduled for October 1 was postponed until November 5 because of a health problem suffered by Mr. Beuerlein. In the interim, Condor sought leave to file a motion to deny confirmation based on the debtor's proof. The debtor did not object, and Condor filed its motion on October 7. The debtor filed a lengthy response. Oral argument on the motion was held October 21.

The following constitutes the court's findings of fact and conclusions of law on Condor's Motion to Deny Confirmation of Debtor's Third Amended Plan at the Close of Debtor's Proof.

### II. Discussion

Section 1129(a)(11), commonly referred to as the feasibility requirement, al-

lows a court to confirm a Chapter 11 case only if "[c]onfirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan." 11 U.S.C. § 1129(a)(11). The test for feasibility entails an examination of several factors:

> (1) the adequacy of the [debtor's] capital structure; (2) the earning power of the [debtor's] business; (3) economic conditions [that the debtor will face during the plan period]; (4) the ability of [the debtor's present] management; (5) the probability of the continuation of the same management; and (6) any other related matter which determines the prospects of a sufficiently successful operation to enable performance of the provisions of the plan.

*Teamsters Nat'l Freight Indus. Negotiating Comm. v. U.S. Truck Co. (In re U.S. Truck Co.)*, 800 F.2d 581, 589 (6th Cir.1986) (citing *In re Landmark at Plaza Park, Ltd.*, 7 B.R. 653, 659 (Bankr.D.N.J.1980)); *see In re Rack Eng'g Co.*, 200 B.R. 302, 305 (Bankr.W.D.Pa. 1996).

■ The parties are in agreement that the debtor here, as plan proponent, must prove the feasibility of the plan by a preponderance of the evidence. *Liberty Nat'l Enters. v. Ambanc La Mesa Ltd. Partnership (In re Ambanc La Mesa Ltd. Partnership)*, 115 F.3d 650, 653 (9th Cir.1997), *cert. denied*, —— U.S. ——, 118 S.Ct. 1039, 140 L.Ed.2d 105 (1998); *Heartland Fed. Sav. & Loan Ass'n v. Briscoe Enters., Ltd., II (In re Briscoe Enters., Ltd., II )*, 994 F.2d 1160, 1165 (5th Cir.),

*cert. denied*, 510 U.S. 992, 114 S.Ct. 550, 126 L.Ed.2d 451 (1993); *In re Trevarrow Lanes, Inc.*, 183 B.R. 475, 479 (Bankr.E.D.Mich. 1995) (citing *Briscoe Enterprises, Ltd., II* and other cases).

■ The plan proponent need not guarantee success, but a court cannot confirm a visionary scheme that promises creditors more than the debtor can possibly attain after confirmation, " 'notwithstanding the proponent's sincerity, honesty and willingness to make a best efforts attempt to perform according to the terms of the plan.' " *Rack Eng'g Co.*, 200 B.R. at 305 (quoting 5 COLLIER ON BANKRUPTCY ¶ 1129.02[11], at 1129–61 to 63 (1996)); *In re Ridgewood Apartments of DeKalb County, Ltd.*, 183 B.R. 784, 789 (Bankr.S.D.Ohio 1995)· (not required to prove that debtor will for certain meet economic projections, but cannot confirm a visionary scheme); *In re IPC Atlanta Ltd. Partnership*, 142 B.R. 547, 559–60 (Bankr.N.D.Ga.1992) (Code does not require guarantee of successful reorganization, but plan must offer reasonable prospect of success); *In re Lakeside Global II, Ltd.*, 116 B.R. 499, 507 (Bankr.S.D.Tex.1989) (must demonstrate a reasonable assurance of commercial viability).

■ It is axiomatic that proof of feasibility is an easier task when the payout is done over a short period of time. The § 1111(b) electing creditor, therefore, gains a statutorily granted advantage because the longer the proposed plan, the more difficult it is for the debtor to prove feasibility.[2] Many courts have found proof of feasibility wanting when long-term payouts are contemplated.[3] In

---

2. If a creditor seeks to block confirmation, exercising the § 1111(b) election may force the debtor to lengthen the loan terms enough to render the question of feasibility so speculative that the bankruptcy court will decline to confirm the plan. Steven R. Haydon et al., *The 1111(b)(2) Election: A Primer*, 13 BANKR. DEV. J. 99, 132 (1996).

3. *See, e.g., In re Kovalchick*, Ch. 11 Case No. 91–24182DAS, 1995 WL 118171, at *8 (Bankr. E.D.Pa. Mar. 15, 1995) ("Although a lengthy payment term is not a per se indication that a plan in question is not feasible, certainly our scrutiny in this regard must grow more exacting as the payment term lengthens." The court denied confirmation of a plan proposing a 30–year

repayment by two individual debtors and their wives on a disputed lease/sale of mining equipment.); *In re VIP Motor Lodge, Inc.*, 133 B.R. 41, 45 (Bankr.D.Del.1991) ("Thirty years is an extraordinarily long payout period and, though Chapter 11 has no express limitation on the length of a plan …, the court must find a 30–year payback term unreasonably long [for the amortization of a debt for a motel]…."); *In re Edgewater Motel, Inc.*, 85 B.R. 989 (Bankr. E.D.Tenn.1988) (finding that the debtor's ability to retire the claim of its major secured creditor was speculative at best, where the claim was to be paid off by deferring payments until late in the plan and refinancing or selling the property in year 10); *In re Snider Farms, Inc.*, 83 B.R. 1003, 1012–14 (Bankr.N.D.Ind.1988) (In a Chapter 12

this case, the debtor must show that its plan has a reasonable prospect of success, but its task is made more difficult because the payments under the proposed plan extend over almost 60 years.

■ The court has found no reported decision in which a court confirmed a Chapter 11 plan of a duration longer than 35 years and no case even approaching a proposed 59–year payout. Although a lengthy payout term is not a per se indication that a plan is not feasible, the scrutiny of such a plan must be exacting. An examination of the feasibility factors as applied to the proof in this case will provide a structure for this analysis.

### 1. Adequacy of the Debtor's Capital Structure

The debtor has no equity in the Mallard Pond apartment complex. The property has been valued by the court at $2.65 million. The Condor claim exceeds $14.2 million. During the last 10 years, under the management of Mr. Beuerlein and Mr. Wunderlich, this property has been allowed to deteriorate from an approximate value of $10 million to its present value of $2.65 million.[4] Mr. Lamb testified that because the property has not been properly maintained over the years, it has a shortened economic life.

The plan depends entirely upon the debtor's ability to generate net operating income sufficient to fund the necessary major rehabilitation, constant monthly maintenance, and additional periodic major and minor renovations to keep the complex operating over the next 60 years. The debtor has not paid debt

service since 1991 and has put all available funds back into the property since that time. Despite this, the property continued to deteriorate for at least the first years in which debt service was not paid, and no reserves were built up to fund the major renovation which is now necessary.

The debtor's plan proposes the infusion of only $250,000 in new capital. The estimated administrative expenses will consume almost all of these funds on the effective date of the plan. Despite Mr. Beuerlein's testimony to the contrary, the court finds the prospect of additional capital infusions from the limited partners bleak. It appears as though the debtor had no small difficulty raising this initial $250,000 and, according to Mr. Beuerlein, these persons invested with the understanding (if not promise) that they would receive back their investment by year 10 of the plan.[5] Of course, the debtor will not be able to secure other loans using the property as collateral because of the size of the Condor lien.

### 2. Earning Power of the Debtor's Business

For the five years prior to the bankruptcy, the Mallard Pond apartment complex was unable to generate sufficient revenue to pay debt service. For some time prior to that, the debtor was borrowing in order to pay debt service. Under the debtor's plan, the payments to Condor for the next 60 years will be approximately $20,000 per month. The debtor's projections anticipate that, not

---

confirmation (using Chapter 11 cases to determine the meaning of feasibility), the court held that "[t]here are often many pitfalls in plans that project long term payments and the longer the period a Debtor contemplates to retire plan obligations, the more difficult it may be to prove feasibility.... [S]ome kind of cushion must be provided in the plan to make it feasible, whether it be a Chapter 11, 12 or 13."); *In re Agawam Creative Marketing Assocs. Inc.*, 63 B.R. 612 (Bankr.D.Mass.1986) (debtor failed to show that proposed Chapter 11 plan was feasible, where it was to be funded out of operating revenues over next 30 years, where debtor did not have track record demonstrating profitable operations over even five-year period, and where, even assuming that its financial projections were accurate, debtor had less than $1000 cushion if projections

were not met in first year); *In re White*, 36 B.R. 199, 203–05 (Bankr.D.Kan.1983) (As to a § 1111(b) election: "[I]t may not be a simple task for a debtor to present credible evidence and project its cash flow and ability to service plan payments 30 years hence." Because the debtors could not provide reliable evidence of their ability to service debt 30 years in the future, confirmation was denied.).

4. The debtor's appraiser, Mr. Lamb, testified that, since the property supported a loan of $8 million in 1987, it probably was appraised at that time for $10 million.

5. Mr. Biter, in fact, testified that the debtor intends to start making distributions to the limited partners within the next few years.

only will the debtor be able to make those payments, but it will accumulate substantial reserves out of which capital needs may be met. One factor to consider in determining whether these projections are reasonable and realistic is the debtor's track record. For whatever reason, the debtor only has budget and expenditure documentation going back three years prepetition.

In 1994, the debtor generated approximately $154,000 in net operating income, after payment of normal maintenance and repair expense. (Ex. UU.) The debtor chose to spend approximately $142,000 of that accumulation on "extraordinary expenses" (equivalent to "capital needs" in the debtor's plan projections). (Ex. TT.) In 1995, the debtor generated approximately $201,000 of net operating income, $198,000 of which was spent on capital improvements. (Ex. VV.) In 1996, the debtor generated approximately $189,000 of net operating income, approximately $183,000 of which was devoted to capital expenditure. (Ex. WW.) Of course, the net operating income figures for these three years are not truly NOI because debt service was not being made.

The debtor's documented track record for the three years prepetition establishes that, during none of those years, did the debtor generate sufficient net operating income to make the $240,000 debt service payments anticipated to be made to Condor under the plan, let alone accumulate the reserves projected under the plan (ranging from $120,000 to $235,000 in each of the first 10 years of the plan). There is no reason to presume that the expenses reflected in the budget from the prepetition years would be lower in future years, and there was no proof indicating such. Despite the debtor's hope that it will be able to attract a better quality of tenant, it would be mere speculation to suppose that the debtor will be able to do so and thereby decrease its ordinary maintenance and repair expense.[6] In addition, if the debtor cannot even maintain its prepetition level of capital expenditure because it is having to pay debt service, Mallard Pond will continue in a

downward spiral of deterioration, such that the debtor's projected income will not even be achieved.

The debtor's projections go out only 10 years. The debtor asserts that it will simply continue in the same pattern over the next 50. That assumes, at a minimum, that the Mallard Pond apartment complex will remain a viable, operating entity for the next 60 years, and the proof to support that assertion was thin indeed.

The debtor's witness most competent to testify about the staying power of this complex was Mr. Lamb, its appraiser. He testified that he could not determine how long this property would last as an apartment complex but that year-to-year maintenance and capital expenditures would make the property last "for a very long time." He did opine that, if the debtor expended all of the funds projected for maintenance and capital improvement, the property would last for another 22 years. On cross-examination, he very specifically stated that he was not testifying that the debtor's plan had sufficient money built into it to do all of the maintenance and renovation necessary to maintain this property over the life of the plan (60 years). Mr. Lamb testified very vaguely about apartment buildings and military housing that has lasted 60 years or more. This testimony was of extremely limited value, given the fact that Mr. Lamb made no comparisons between the original construction and periodic renovation of these properties as compared with the debtor's.

The debtor's expert Andrew Higgins offered the conclusion that, since 30–year mortgages are presently being made on apartments built in the 1960s, lenders, at least, must be presuming that apartments of this vintage will last a long time. However, this plan does not propose a 30–year payout; it proposes a 60–year one.

Mr. Biter, the debtor's off-site property manager, did state that, if the debtor continued over the life of the plan to set aside $120,000 in reserves for capital improvements, the buildings could "go on forever."

---

**6.** Mr. Biter testified that projects which attract the type of tenant which Mallard Pond does suffer extra wear and tear.

However, Mr. Biter's qualifications to give this opinion are thin, the assumption that the debtor will be able to set aside these reserves over the life of the plan is questionable, and the projected yearly set-aside for reserves takes no account of inflation over the course of the next 60 years.

Some of the debtor's proof went to possible alternative uses for the property over the life of the plan: (1) conversion to a different commercial use (assuming the appropriate zoning changes could be obtained); (2) demolition of all improvements, leaving raw land for a land lease; or (3) demolition to build a new multi-family facility.

Mr. Beuerlein testified that he did not foresee any of the above conversions and did not plan on making any of them. These alternatives were just possible uses of the property, should the economic life of the current improvements not sustain the property in order to pay Condor over the life of the plan. Mr. Beuerlein testified that, should one of these alternatives become necessary, the debtor would fund the costs of the demolition and/or improvements out of built-up surplus cash or obtain new financing. Mr. Lamb estimated the cost of demolition at $700,000 to $1,000,000 in today's dollars. No testimony was offered as to construction costs of new improvements.

The debtor's proof as to the possible future uses of the property is entirely too speculative to be given any weight by the court.

### 3. Future Economic Conditions

Mr. Biter, Mr. Higgins, and Mr. Lamb all admitted that they had no way of knowing what would happen in the economy twenty years from now, much less 30, 40, 50 or even 60 years from now. Although Mr. Lamb predicted a 3% inflation factor for the value of the raw land, that was based on general trends; he admitted that there is no way to know what the raw land would be worth in any given year in the future.

The debtor's projections show steady climbs in rent and net operating income over the course of the next ten years, and the debtor asks the court to believe that those trends will continue over 60 years. Mr. Higgins, the debtor's own expert, testified that there will be peaks, valleys and cycles in the economic life of an apartment complex, and the debtor must be able to weather those "blips." The court is unconvinced that the debtor can generate from this property the funds to make even the capital improvements which will be absolutely necessary over time. The proof does not support the conclusion that the debtor will be able to "weather the blips" over the next 60 years.

### 4. Ability of Debtor's Present Management and the Probability of its Continuation

Mr. Beuerlein and Mr. Wunderlich have managed this apartment complex for the past ten years through companies owned by them or their wives. They must bear most of the responsibility for the fact that Mallard Pond has plunged in value over the years, is presently in a deplorable state of repair, and, because of their failure to pay the mortgage for five years prepetition, must attempt to finance payment of a $14.2 million indebtedness through a Chapter 11 plan.

Under the plan, present management will continue in place. The new general partner under the plan will be Creekside Investment Company, Inc., which is owned equally by Mrs. Beuerlein and Mrs. Wunderlich. Mr. Wunderlich is the president of the new general partner, and Mr. Beuerlein is the Vice–President and Secretary–Treasurer of the new general partner.[7] This new, insider general partner is scheduled to receive a $20,000 annual management fee.[8]

The debtor gives great weight to the involvement of Mr. Biter's company, Continental Property Management, in the affairs of Mallard Pond. Mr. Biter is a lone non-insider voice in the debtor's affairs, but his voice

---

7. Creekside Investment Company was formed in 1992 to be the new general partner of Creekside Landing Limited, which was taken through a Chapter 11 reorganization by these same principals in 1992.

8. The management fee does not appear in the debtor's projections. Continental Property Management will receive a share of it pursuant to its subcontract with Asset Realty.

may, in fact, be one crying in the wilderness. Mr. Biter testified during the confirmation hearing that he and Mr. Charles Dailey, Condor's engineer, did a joint inspection of Mallard Pond units in June 1997. They agreed upon a list of repairs and improvements needed for many of the Mallard Pond apartment units, including new carpet, sheet rock repair, repair of heating and air conditioning systems, repair of leaks, tile, replacement of appliances, etc. (Ex. 7.) This list was forwarded to the debtor's on-site manager, Brenda Arnold. According to her testimony, she made her own judgment that a large number of these agreed-upon improvements did not need to be done and, therefore, they were not done. It is clear that on-site management, under the direct control of the principals, is making the important decisions that will affect the future viability of the project.

According to the debtor's disclosure statement, the principals of this debtor have taken several other apartment complexes through bankruptcy or voluntarily surrendered them to lenders. Those troubled projects were: (1) Courtyard Apartments, where a sale of the property pursuant to a consensual Chapter 11 plan fell through and the debtor surrendered the property to the lender; (2) Pineview Apartments, where, following a failed consensual plan, the debtor surrendered the property to the lender; (3) Willow Oaks Apartments, where the property was voluntarily surrendered to the lender; (4) Raleigh Station Apartments, where the property was voluntarily surrendered to the lender; and (5) Creekside Landing, the only project that has successfully reorganized in Chapter 11. In addition, Mr. Beuerlein is presently in a personal bankruptcy, and the disclosure statement reveals that Mr. Wunderlich has a negative net worth. The management of the personal financial affairs of these individuals, as well as those of these apartment complexes, does not instill confidence in the ambitious attempt to reorganize in this case.

Throughout this case, the debtor has touted the successful reorganization of Creekside Landing by these same principals through a Chapter 11 plan confirmed by another judge in this district in 1992. The debtor has used the Creekside Landing case to justify its proposed installation as general partner of Mallard Pond the same insider entity as became the general partner in that case, as well as the continued employment of other insider entities by the debtor. This court finds no inherent problem with the use of insider entities, but the principals operating those entities will remain in full control of the reorganized debtor, and the proof of their ability that is before this court leaves much to be desired.

The principals will remain in control as long as they can. The court hazards a guess, in the absence of proof, that Mr. Beuerlein and Mr. Wunderlich are in their forties. They will not be managing the affairs of Mallard Pond to the conclusion of the plan payments. No proof was presented as to their possible successors, so a judgment about the abilities and competence of their successors may not be made.

### 5. Other Relevant Considerations

The debtor offered testimony that in the market today there are 30–year mortgages with full term amortizations being made on multi-family projects that are of the same age as the subject property. Accepting this testimony as true, it does little to support the debtor's argument. A new, thirty-year fully amortized mortgage on this property would still only be a thirty-year loan on a 1960s property, not a sixty-year loan. Furthermore, a fully amortized thirty-year loan would be made based on the value of the property and improvements set by the court at $2,650,000, not on a § 1111(b) election forcing a loan of $14,200,000.

The debtor also offered proof that the proposed plan provides adequate cushions to account for any unforeseen expenses that might affect the budget, such as extra cash for replacements in the per unit maintenance and expense figures, cash reserves for post-confirmation rehabilitations and conservative but realistic expectations of rental income growth. Condor argues that these cushions are of little comfort. Because the debtor proposes to fund rehabilitation from money generated from the property, any miscalculation in the budget could potentially mean

that the rehabilitation will not be performed according to the debtor's proposed schedule, and furthermore that no cash reserves would ever be created or if created, the amounts would be insignificant. Even if the reserve account is funded, it will not be funded until year 3, and there is no plan provision mandating that the debtor actually use these funds to support the continued rehabilitation of the improvements.

Mr. Beuerlein and Mr. Biter agreed that although the budget assumes a constant growth in net operating income, it is possible that there will be some years of decline. Condor argues, and the court agrees that any miscalculation by the debtor in the early years of its budget could be fatal to the success of the plan. In fact, the net operating income in 1997 has declined making the debtor's budget even more uncertain. In one month, the debtor had a $4,000 deficiency and was forced to draw down on some accumulated cash collateral. The debtor argues that this decline is due to the constraints of operating in bankruptcy under the cash collateral order, such as unforeseen trustee fees, a broken sewer line and a required upgrade on fire protection system. However, these are exactly the kind of unforeseen expenses that could be fatal to the debtor's plan because there are no reserves for the first years of reorganization, and all money to fund the rehabilitation must be raised from operation of the property. The uncertainty of predicting budgets for sixty years makes the debtor's philosophy of reorganization even more speculative.

## Conclusion

The court is forced to conclude that the debtor's ability to retire Condor's debt over almost sixty years is speculative at best. There are simply too many pitfalls in this plan that proposes such a lengthy payout and is based on the debtor's funding its entire rehabilitation out of revenues generated from the property. This, when over the course of management by the present principals, the debtor has not been able to renovate and pay debt service at the same time. Providing credible evidence of projected cash flow and ability to service plan payments for sixty

years hence is a daunting task, and the debtor has not carried its burden of doing so.

The court finds that liquidation or the need for further rehabilitation would more likely than not occur if the court granted confirmation of the proposed plan. Accordingly, the plan violates § 1129(a)(11), the feasibility requirement, and confirmation must be denied.

An appropriate order will be entered.